1  ROBBINS ARROYO LLP
    BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
    KEVIN A. SEELY (199982)
3  kseely@robbinsarroyo.com
    STEVEN M. MCKANY (271405)
4  smckany@robbinsarroyo.com
    600 B Street, Suite 1900
5  San Diego, CA 92101
    Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  Attorneys for Plaintiff

8              UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10                 SAN FRANCISCO DIVISION

11 TIMOTHY HIMSTREET, Derivatively on    ) Case No.
    Behalf of WELLS FARGO & COMPANY,     )
12                                        )
                            Plaintiff,    ) VERIFIED STOCKHOLDER DERIVATIVE
13        v.                              ) COMPLAINT FOR VIOLATIONS OF
                                          ) SECURITIES LAW, BREACH OF
14 TIMOTHY J. SLOAN, JOHN R.             ) FIDUCIARY DUTY, WASTE OF
    SHREWSBERRY, AVID MODJTABAI,         ) CORPORATE ASSETS, AND UNJUST
15 ELIZABETH A. DUKE, JOHN D. BAKER     ) ENRICHMENT
    II, DONALD M. JAMES, JAMES H.        )
16 QUIGLEY, SUZANNE M. VAUTRINOT,       )
    JOHN G. STUMPF, FRANKLIN R.          )
17 CODEL, DAWN MARTIN HARP,             )
    CARRIE L.TOLSTEDT, STEPHEN W.        )
18 SANGER, CYNTHIA H. MILLIGAN,         )
    JUDITH M. RUNSTAD, SUSAN G.          )
19 SWENSON, SUSAN E. ENGEL, ENRIQUE     )
    HERNANDEZ, JR., LLOYD H. DEAN,       )
20 JOHN S. CHEN, ELAINE L. CHAO, and    )
    FEDERICO F. PEÑA,                    )
21                                        )
                            Defendants,   )
22        -and-                           )
                                          )
23 WELLS FARGO & COMPANY, a             )
    Delaware corporation,                )
24                                        )
                     Nominal Defendant.   )
25 _____ ) DEMAND FOR JURY TRIAL

26

27

28

_____
                VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.   Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.   This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.   This is a verified stockholder derivative action brought by plaintiff, a stockholder of Wells Fargo & Company ("Wells Fargo" or the "Company"), on behalf of the Company against certain of its current and former officers and directors.   This action seeks to remedy the defendants' violations of law addressed herein, including violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment that have caused substantial damage to Wells Fargo.

2.   As has been widely reported, in September 2016, Wells Fargo admitted in settlements with the U.S. Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC") that over the span of several years, Wells Fargo created millions of fake credit card and bank accounts for customers without their permission (the "Fake Accounts Scheme").   As the Company's then Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO"), defendant John G. Stumpf ("Stumpf"), admitted at the time during a U.S. Senate hearing, this deplorable and illegal behavior was the result of massive failures by Wells Fargo's senior management and Board, who all failed "to fulfill [their] responsibility to [Wells Fargo's] customers, [the Company's] team members and to the American public."   To date, the Company has paid hundreds of millions of dollars in fines, settlements, and legal fees as a result of now infamous Fake Accounts Scheme.

3.    Following the above revelations about the Fake Accounts Scheme, Wells Fargo and its fiduciaries repeatedly touted significant and meaningful company-wide reforms, enhanced internal controls and Board oversight, and Wells Fargo's purported unwavering

commitment to transparency.  For example, on September 19, 2016, defendant Stumpf testified to the U.S. Senate that the "[w]rongful sales practice behavior in [the Company's] retail banking business goes against everything regarding [Wells Fargo's] core principles, [its] ethics and [its] culture," that the Company was "fully committed to fixing this issue, strengthening [its] culture and taking the necessary actions to restore [its] customer's trust," and that "the Wells Fargo [B]oard is actively engaged in this issue."  To date, the Company and its fiduciaries have repeatedly continued to make similar representations, including in press releases, SEC filings, and in numerous nationwide advertisements.  Unfortunately, these empty promises have done little to curb the Company's rampant and illegal abuses, which continue to surface on a regular basis.[1]

4.      In January 2017, reports first surfaced from former Wells Fargo employees alleging that for years the Company systematically engaged in a pattern and practice of improperly charging its mortgage customers wrongful fees to extend their promised interest rate when their initial mortgage paperwork was delayed by Wells Fargo (the "Rate Lock Scheme").  Although the loan closing delays were often the Company's fault, which prohibited Wells Fargo from charging rate lock fees, its management instructed employees to falsely blame customers for the delays.  After falsely blaming the customers for the delays, the Company then wrongfully charged those customers fees of up to $1,000 or more to lock in the initially promised rate while Wells Fargo belatedly completed its underwriting and loan closing process.  Although the CFPB began investigating this wrongful practice no later than June 2017 and a whistleblower filed a related lawsuit against the Company in July 2017, the Company did not mention the Rate Lock Scheme in any of its SEC filings until August 2017, when the Company finally admitted it was under investigation by the CFPB.  The same month, multiple consumers filed class action

---

[1] To be clear, the Fake Accounts Scheme itself is not the subject of this action.  Rather, this action concerns the Board's continuing failures to timely address and remedy Wells Fargo's knowingly deficient internal controls, and also the Company's continuing widespread misdeeds in other areas.

lawsuits against Wells Fargo alleging they suffered significant harm as a result of the Rate Lock Scheme.

5.      On July 27, 2017, *The New York Times* (the "*Times*") published an article revealing yet another widespread multiyear Wells Fargo scheme to defraud customers, titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers."  Citing an internal Wells Fargo report that was obtained by the *Times* and prepared for the Company's executives, the article revealed that over the span of several years, "[m]ore than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need" because they were already insured, and that the "expense of the unneeded insurance … pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions" (the "Forced Insurance Scheme").  According to the *Times*, the internal report also estimated that Wells Fargo owed $73 million to customers that were harmed by the Forced Insurance Scheme. In response to questions from the *Times*, the Company's head of consumer lending, defendant Franklin R. Codel ("Codel"), acknowledged that "[Wells Fargo has] a huge responsibility and fell short of [its] ideals for managing and providing oversight of… [the Company's] own operations."

6.      Also on July 27, 2017, the Company issued a press release admitting its wrongful Forced Insurance Scheme, and claiming Wells Fargo stopped the practice in September 2016 after several months of internal investigations.  The press release did not explain why the Company waited nearly a year after purportedly internally discovering its wrongdoing in connection with the Forced Insurance Scheme before finally disclosing it to the public on the same day as the *Times* article exposed the scheme.

7.      The following day, Wells Fargo's stock price tumbled nearly 3%, wiping out nearly $8 billion in market capitalization.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

8.     In mid to late-October 2017, the *Wall Street Journal* (the "*Journal*") revealed for the first time that Wells Fargo fired four of its foreign exchange ("forex")[2] bankers, that the Company had launched an internal investigation into potential forex improprieties, and that "regulators are also probing [Wells Fargo's] foreign-exchange business."   The *Journal* also disclosed that the U.S. Attorney's Office for the Northern District of California and the Federal Reserve had opened an investigation concerning improper forex fees charged by Wells Fargo. The following month, reports from former Wells Fargo employees surfaced suggesting that the issue was, in fact, widespread throughout the Company's forex business, revealing that for more than a decade Wells Fargo had been secretly and improperly charging excessive forex fees to a substantial portion of the Company's large- to mid-size business customers, with fees that were approximately two to eight times higher than the market average (the "Forex Scheme"). According to former employees, unlike other banks, Wells Fargo's forex employees received bonuses based solely on how much revenue they brought in, which in turn encouraged them to hide additional fees in forex trades, relying on the facts that customers often did not bother to double check how much they were charged and that fee levels were not straightforward. Although investigations remain in their early stages, it appears that through the Forex Scheme, Wells Fargo wrongfully cheated customers out of tens or hundreds of millions of dollars, and the Company rewarded employees for their participation in the scheme though lavish bonuses.

9.     On February 2, 2018, the Federal Reserve shocked the market when it announced that in response "to recent and widespread consumer abuses and other compliance breakdowns by Wells Fargo," the Federal Reserve sanctioned the Company for failing to have proper risk controls (the "Enforcement Action").   The unprecedented Enforcement Action ***barred the Company from growing*** past the $1.95 trillion in assets it had at the end of 2017 and, as a result of the Board's continuing ineffectiveness and lack of oversight, ***required Wells Fargo to replace four Board members***.

---

[2] Foreign exchange is the exchange of one currency for another or the conversion of one currency into another currency.  The global foreign exchange market is the largest financial market in the world, with average daily volumes in the trillions of dollars.

10.     The next trading day, February 5, 2018, Wells Fargo's stock price plummeted 9.2%, its sharpest one-day drop in nearly a decade, erasing approximately **$29 billion** in market capitalization.

11.     On March 1, 2018, in a filing with the SEC, Wells Fargo disclosed yet another widespread improper scheme for the first time.  According to the Company, "in response to inquiries from federal government agencies," the Board is now investigating whether Wells Fargo had made "inappropriate referrals or recommendations [to its Wealth and Investment Management customers], including with respect to rollovers for 401(k) plan participants, certain alternative investments, or referrals of brokerage customers to the Company's investment and fiduciary services business" (the "Retirement Scheme").  As noted by the *Journal* the same day, "The Justice Department in late 2017 told the bank to conduct an independent investigation of its wealth-management business after whistleblowers from the bank alleged sales problems to the agency."  As was later revealed by the *Journal*, the Retirement Scheme is now the subject of a probe by the U.S. Labor Department, which is investigating whether Wells Fargo has been improperly pushing participants in low-cost corporate 401(k) plans to roll their holdings into more expensive individual retirement accounts at the Company, and whether Wells Fargo's retirement-plan services unit improperly pressed account holders to buy Wells Fargo's in-house funds.

12.     On April 13, 2018, Wells Fargo announced that it may need to revise its first quarter 2018 results as a result of a potentially looming, massive **$1 billion settlement** with the CFPB and OCC related to the Company's woefully inadequate risk management.  In response, the Company's stock price tumbled 3.4% the same day, wiping out another $8.8 billion in market capitalization.

13.     On April 20, 2018, the CFPB and the OCC each announced separate Consent Orders concerning, among other things, Wells Fargo's improper Rate Lock Scheme and Forced Insurance Scheme (the "Consent Orders").  The Consent Orders confirmed that Wells Fargo would be forced to pay $1 billion in fines and penalties to settle with the CFPB and OCC, with $500 million paid to each regulatory organization, respectively.  While both Consent Orders

largely focused on the Company's improper Rate Lock Scheme and Forced Insurance Scheme, the OCC Consent Order also found that in general, Wells Fargo operated with "deficiencies and reckless unsafe or unsound practices with respect to [its] compliance risk management program," including, among other things, by: (i) "[f]ail[ing] to implement a reliable compliance risk assessment and testing program"; (ii) by implementing "[i]nadequate reporting to the Board regarding compliance concerns, the regulatory landscape, and the [Company's] efforts to correct its compliance problems and address regulatory changes"; and (iii) by "[f]ail[ing] to adequately develop and implement key elements of [Wells Fargo's] compliance risk management program designed to ensure that the [Company] addressed risks related to potential unfair or deceptive acts or practices since 2014."  Of note, the Company's Retirement Scheme and Forex Scheme remain under investigation by state and federal agencies, and those ongoing matters were not settled as part of the Consent Orders.

14.     None of the rampant, company-wide wrongdoing described herein would have been possible without Board's repeated failures to adequately and timely enhance the Company's internal controls, or the Board's continuing tacit approval or willingness to turn a blind eye.  The Individual Defendants' (as defined herein) actions have devastated Wells Fargo, as is evident from the billion dollar fine from the CFPB and OCC, and the tens of billions of dollars in market capitalization losses when news of the Company's wrongdoing emerged.  The Company has also been forced to agree to pay full restitution to all victims, and remains the subject of multiple class action lawsuits filed on behalf of wronged customers (the "Consumer Class Actions").  In addition, at least one class action complaint has been filed in the U.S. District Court for the Northern District of California against the Company and certain Individual Defendants alleging violations of the federal securities laws in connection with certain false statements concerning the Company's Forced Insurance Scheme (the "Securities Class Action").

15.     Making matters worse, defendants made multiple materially false or misleading statements, which, among other things, caused the Company to repurchase approximately 209.8 million shares of Wells Fargo stock between December 2016 and December 2017, at prices that were artificially inflated due to those misstatements or omissions.  Further, in 2017, long after

the Board was aware of the systemic problems at Wells Fargo, the Individual Defendants issued a materially misleading Proxy Statement urging stockholders to vote to reelect the directors and approve executive compensation packages, among other things (the "2017 Proxy").  In seeking stockholder votes in accord with the Board's recommendations, the 2017 Proxy omitted material information concerning, among other things: (i) the Forced Insurance Scheme; (ii) the Rate Lock Scheme; (iii) the Forex Scheme; (iv) the Retirement Scheme; and (v) the Board's continuing failures to timely address and remedy Wells Fargo's woefully inadequate internal controls and culture of lawlessness.  Tellingly, four directors that were reelected at the Company's 2017 Annual Meeting of Stockholders pursuant to the misstatements in the 2017 Proxy were subsequently forced to leave the Board by the Federal Reserve because the Company's widespread consumer abuses and compliance breakdowns continued unabated.

16.    Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

17.    Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

18.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Wells Fargo maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in

violation of fiduciary duties owed to Wells Fargo, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

20.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of San Francisco, and as such, this action is properly assigned to the San Francisco division of this Court.

## THE PARTIES

**Plaintiff**

21.     Plaintiff Timothy Himstreet is a current Wells Fargo stockholder and has continuously been a stockholder of Wells Fargo since August 2014.

**Nominal Defendant**

22.     Nominal defendant Wells Fargo is a Delaware corporation with principal executive offices located at 420 Montgomery Street, San Francisco, California.  Wells Fargo is a financial holding company and a bank holding company.  Through its subsidiaries the Company provides retail, commercial, and corporate banking services in all fifty states, the District of Columbia and in other countries.  The Company also provides other financial services through subsidiaries engaged in various businesses such as wholesale banking, mortgage banking, consumer finance, commercial finance, securities brokerage and investment banking, investment advisory services, mortgage-backed securities servicing, and venture capital investment.  As of December 31, 2017, the Company had 262,700 full-time employees.

**Defendants**

23.     Defendant Timothy J. Sloan ("Sloan") is Wells Fargo's CEO and a director and has been since October 2016 and President and has been since November 2015.  Defendant Sloan was also Wells Fargo's Chief Operating Officer from November 2015 to October 2016; Senior Executive Vice President (Wholesale Banking) from May 2014 to November 2015; Senior Executive Vice President and Chief Financial Officer from February 2011 to May 2014; and has held various other positions with the Company or its predecessors since 1988.

Defendant Sloan is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Sloan knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Sloan also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions. Defendant Sloan also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Sloan the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $2,400,000 | $15,000,007 | - | $56,749 | $107,258 | $17,564,014 |
| 2016 | $2,329,502 | $10,500,038 | - | $166,624 | $18,550 | $13,014,714 |
| 2015 | $2,000,000 | $8,000,084 | $1,000,000 | $20,054 | $18,550 | $11,038,688 |

24.     Defendant John R. Shrewsberry ("Shrewsberry") is Wells Fargo's Senior Executive Vice President and Chief Financial Officer and has been since May 2014.  Defendant Shrewsberry was also Wells Fargo's President and CEO, Wells Fargo Securities from November 2009 to May 2014, and has held various other positions with the Company or its predecessors since 1999.  Defendant Shrewsberry is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Shrewsberry knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made

improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct. Defendant Shrewsberry also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions. Wells Fargo paid defendant Shrewsberry the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $1,956,731 | $9,000,051 | $950,000 | $14,708 | $18,900 | $11,940,390 |
| 2016 | $1,741,188 | $7,500,041 | - | $16,913 | $18,550 | $9,276,692 |
| 2015 | $1,700,000 | $6,500,036 | $850,000 | $3,395 | $18,550 | $9,071,981 |

25.     Defendant Avid Modjtabai ("Modjtabai") is Wells Fargo's Senior Executive Vice President (Payments, Virtual Solutions, and Innovation) and has been since November 2016. Defendant Modjtabai was also Wells Fargo's Senior Executive Vice President (Consumer Lending) from July 2011 to November 2016; Executive Vice President and Chief Information Officer from April 2007 to July 2011; Executive Vice President (Human Resources) from June 2005 to April 2007; and has held various other positions with the Company or its predecessors since 1994. Defendant Modjtabai knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct. Defendant Modjtabai also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions. Wells Fargo paid defendant Modjtabai the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $1,750,000 | $8,000,058 | $831,250 | $24,764 | $18,900 | $10,624,972 |
| 2016 | $1,741,188 | $7,500,041 | - | $30,269 | $18,550 | $9,290,048 |
| 2015 | $1,700,000 | $6,500,036 | $850,000 | $9,254 | $18,550 | $9,077,840 |

26.     Defendant Elizabeth A. Duke ("Duke") is Wells Fargo's Chairwoman of the Board and has been since January 2018 and a director and has been since January 2015. Defendant Duke was also Wells Fargo's Vice Chairwoman of the Board from October 2016 to December 2017.  Defendant Duke is a member of Wells Fargo's Risk Committee and has been since January 2015; a member of the Finance Committee and has been since January 2016; a member of the Credit Committee and has been since at least March 2016; and a member of the Governance and Nominating Committee and has been since September 2017.  Defendant Duke knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Duke also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Duke also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Duke the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2017 | $303,000 | $180,048 |  | $483,048 |
| 2016 | $201,131 | $180,002 | $5,000 | $386,133 |
| 2015 | $121,000 | $233,414 | - | $354,414 |

27.     Defendant John D. Baker II ("Baker") is a Wells Fargo director and has been since January 2009.  Defendant Baker is also Chairman of Wells Fargo's Credit Committee and

has been since January 2018 and a member of that committee and has been since at least March 2014; a member of the Audit & Examination Committee and has been since at least March 2014; and a member of the Corporate Responsibility Committee since at least March 2014.  Defendant Baker knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Baker also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions. Defendant Baker also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Baker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $193,000 | $180,048 | - | $373,048 |
| 2016 | $207,000 | $180,002 | $5,000 | $392,002 |
| 2015 | $181,000 | $180,027 | - | $361,027 |

28.     Defendant Donald M. James ("James") is a Wells Fargo director and has been since January 2009.  Defendant James is also Chairman of Wells Fargo's Governance and Nominating Committee and a member of that committee and has been since September 2017; a member of the Finance Committee and has been since at least March 2014; and a member of the Human Resources Committee and has been since at least March 2014.  Defendant James knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal

conduct.  Defendant James also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant James also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant James the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $167,333 | $180,048 | - | $347,381 |
| 2016 | $141,000 | $180,002 | $5,000 | $326,002 |
| 2015 | $113,000 | $180,027 | - | $293,027 |

29.    Defendant James H. Quigley ("Quigley") is a Wells Fargo director and has been since October 2013.  Defendant Quigley is also Chairman of Wells Fargo's Audit & Examination Committee and a member of that committee and has been since January 2014; a member of the Credit Committee and has been since at least March 2015; and a member of the Risk Committee and has been since at least March 2014.  Defendant Quigley knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Quigley also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Quigley also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Quigley the following compensation as a director:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $245,000 | $180,048 | $425,048 |
| 2016 | $249,000 | $180,002 | $429,002 |
| 2015 | $202,000 | $180,027 | $382,027 |

30.     Defendant Suzanne M. Vautrinot ("Vautrinot") is a Wells Fargo director and has been since February 2015.  Defendant Vautrinot is also Chairwoman of Wells Fargo's Corporate Responsibility Committee and has been since April 2018 and a member of that committee and has been since September 2017; a member of the Credit Committee and has been since February 2016; and a member of the Risk Committee and has been since September 2017.  Defendant Vautrinot was also a member of Wells Fargo's Audit & Examination Committee from February 2015 to September 2017.  Defendant Vautrinot knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Vautrinot also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Vautrinot also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Vautrinot the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $157,000 | $180,048 | $337,048 |
| 2016 | $153,000 | $180,002 | $333,002 |
| 2015 | $104,750 | $220,060 | $324,810 |

31.     Defendant Stumpf was Wells Fargo's Chairman of the Board from January 2010 to October 2016; CEO from June 2007 to October 2016; a director from June 2006 to October 2016; President from August 2005 to November 2015; Chief Operating Officer from August 2005 to June 2007; and held various other positions with the Company or its predecessors

beginning in 1982.  Defendant Stumpf knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Stumpf also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Wells Fargo paid defendant Stumpf the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $2,070,498 | $16,500,032 | - | $2,687,722 | $83,646 | $21,341,898 |
| 2015 | $2,800,000 | $12,500,054 | $4,000,000 | - | $18,550 | $19,318,604 |

32.     Defendant Codel was Wells Fargo's Senior Executive Vice President (Consumer Lending) from November 2016 to November 2017; Executive Vice President (Home Lending) from October 2015 to November 2016; Executive Vice President (Mortgage Production) from March 2011 to September 2015; and held various other positions with the Company or its predecessors beginning in 1994.  Defendant Codel knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; and (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public.

33.     Defendant Dawn Martin Harp ("Martin Harp") was Wells Fargo's Head of Dealer Services from 2011 to April 2017; Chief Operating Officer, Dealer Services from at least 2008 to 2011; and held various other positions with the Company or its predecessors beginning in 1998. Defendant Martin Harp knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take

appropriate action to curb the widespread illegal abuses; and (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public.

34.     Defendant Carrie L. Tolstedt ("Tolstedt") was Wells Fargo's Senior Executive Vice President (Community Banking) from June 2007 to September 2016; Group Executive Vice President (Regional Banking) from July 2002 to June 2007; Group Executive Vice President (California and Border Banking) from January 2001 to June 2002; and held various other positions with the Company or its predecessors beginning in 1990.  Defendant Tolstedt knowingly, recklessly, or with gross negligence: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Tolstedt also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Wells Fargo paid defendant Tolstedt the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $1,285,249 | $7,500,041 | - | $59,081 | $15,900 | $8,860,271 |
| 2015 | $1,700,000 | $6,500,036 | $850,000 | $23,095 | $18,550 | $9,091,681 |

35.     Defendant Stephen W. Sanger ("Sanger") was Wells Fargo's Chairman of the Board from October 2016 to December 2017; Lead Director from January 2012 to October 2016; and a director from July 2003 to December 2017.  Defendant Sanger was also Chairman of Wells Fargo's Governance and Nominating Committee and a member of that committee from at least March 2014 to September 2017; a member of the Human Resources Committee from at least March 2014 to December 2017; and a member of the Risk Committee from at least March 2014 to September 2017.  Defendant Sanger knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate

action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Sanger also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices the he knew were artificially inflated by their misleading statements and omissions.  Defendant Sanger also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.   Wells Fargo paid defendant Sanger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $429,000 | $180,048 | - | $609,048 |
| 2016 | $300,628 | $180,002 | $5,000 | $485,630 |
| 2015 | $202,000 | $180,027 | - | $382,027 |

36.     Defendant Cynthia H. Milligan ("Milligan") was a Wells Fargo director from July 1992 to December 2017.  Defendant Milligan was also Chairwoman of Wells Fargo's Credit Committee and a member of that committee from at least March 2014 to December 2017; a member of the Corporate Responsibility Committee from at least March 2014 to December 2017; a member of the Governance and Nominating Committee from at least March 2014 to September 2017; and a member of the Risk Committee from at least March 2014 to September 2017.   Defendant Milligan knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Milligan also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Milligan also negligently violated section 14(a) of the Exchange Act by

causing Wells Fargo to make misleading statements in its 2017 Proxy. Wells Fargo paid defendant Milligan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
| --- | --- | --- | --- | --- |
| 2017 | $188,000 | $180,048 | - | $368,048 |
| 2016 | $192,000 | $180,002 | $5,000 | $377,002 |
| 2015 | $172,000 | $180,027 | - | $352,027 |

37. Defendant Judith M. Runstad ("Runstad") was a Wells Fargo director from May 1998 to April 2016. Defendant Runstad was also Chairwoman of Wells Fargo's Corporate Responsibility Committee from at least March 2014 to March 2016 and a member of that committee from at least March 2014 to April 2016; a member of the Credit Committee from at least March 2014 to April 2016; a member of the Finance Committee from at least March 2014 to April 2016; and a member of the Risk Committee from at least March 2014 to March 2016. Defendant Runstad knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct. Defendant Runstad also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions. Wells Fargo paid defendant Runstad following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $76,327 | - | $76,327 |
| 2015 | $204,000 | $180,027 | $384,027 |

38. Defendant Susan G. Swenson ("Swenson") was a Wells Fargo director from November 1998 to December 2017. Defendant Swenson was also a member of Wells Fargo's Audit & Examination Committee from at least March 2014 to December 2017 and a member of the Governance and Nominating Committee from at least March 2014 to September 2017.

Defendant Swenson knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.   Defendant Swenson also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Swenson also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Swenson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $175,000 | $180,048 | $355,048 |
| 2016 | $177,000 | $180,002 | $357,002 |
| 2015 | $129,000 | $180,027 | $309,027 |

39.     Defendant Susan E. Engel ("Engel") was a Wells Fargo director from November 1998 to April 2017.  Defendant Engel was also a member of Wells Fargo's Credit Committee from at least March 2014 to April 2017; a member of the Finance Committee from at least March 2014 to April 2017; and a member of the Human Resources Committee from at least March 2014 to April 2017.  Defendant Engel knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Engel also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.   Wells Fargo paid defendant Engel the following

compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $57,000 | - | $57,000 |
| 2016 | $159,000 | $180,002 | $339,002 |
| 2015 | $151,000 | $180,027 | $331,027 |

40.     Defendant Enrique Hernandez, Jr. ("Hernandez") was a Wells Fargo director from January 2003 to April 2018.  Defendant Hernandez was also Chairman of Wells Fargo's Finance Committee and a member of that committee from at least March 2014 to April 2018; Chairman of the Risk Committee from at least March 2014 to September 2017 and a member of that committee from at least March 2014 to April 2018; a member of the Audit & Examination Committee from at least March 2014 to March 2016; and a member of the Corporate Responsibility Committee from at least March 2014 to April 2018.   Defendant Hernandez knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Hernandez also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Hernandez also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Hernandez the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $226,667 | $180,048 | - | $406,715 |
| 2016 | $236,000 | $180,002 | $5,000 | $421,002 |
| 2015 | $217,000 | $180,027 | $5,000 | $402,027 |

41.     Defendant Lloyd H. Dean ("Dean") was a Wells Fargo director from June 2005 to April 2018.  Defendant Dean was also Chairman of Wells Fargo's Human Resources Committee and a member of that committee from at least March 2014 to April 2018; a member of the Corporate Responsibility Committee from at least March 2014 to April 2018; a member of the Governance and Nominating Committee from at least March 2014 to April 2018; and a member of the Risk Committee from at least March 2014 to September 2017.   Defendant Dean knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Dean also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Dean also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Dean the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $202,000 | $180,048 | $382,048 |
| 2016 | $196,000 | $180,002 | $376,002 |
| 2015 | $166,000 | $180,027 | $346,027 |

42.     Defendant John S. Chen ("Chen") was a Wells Fargo director from September 2006 to April 2018.  Defendant Chen was also a member of Wells Fargo's Human Resources Committee from at least March 2014 to April 2018.  Defendant Chen knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning

the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Chen also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Chen also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.  Wells Fargo paid defendant Chen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $119,000 | $180,048 | $299,048 |
| 2016 | $123,000 | $180,002 | $303,002 |
| 2015 | $99,000 | $180,027 | $279,027 |

43.    Defendant Elaine L. Chao ("Chao") was a Wells Fargo director from July 2011 to January 2017.  Defendant Chao was also a member of Wells Fargo's Credit Committee and at least March 2014 to January 2017 and a member of the Finance Committee from at least March 2014 to January 2017.  Defendant Chao knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Chao also breached her fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices she knew were artificially inflated by the Individual Defendants' misleading statements and omissions.   Wells Fargo paid defendant Chao the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $6,250 | - | - | $6,250 |
| 2016 | $127,000 | $180,002 | $5,000 | $312,002 |
| 2015 | $111,000 | $180,027 | - | $291,027 |

44.     Defendant Federico F. Peña ("Peña") was a Wells Fargo director from November 2011 to April 2018.   Defendant Peña was also Chairman of Wells Fargo's Corporate Responsibility Committee from March 2016 to April 2018 and a member of that committee from at least March 2014 to April 2018; a member of the Audit & Examination Committee from at least March 2014 to April 2018; a member of the Governance and Nominating Committee from at least March 2014 to April 2018; and a member of the Risk Committee from March 2016 to September 2017.  Defendant Peña knowingly or recklessly: (i) failed to appropriately address the Company's knowingly inadequate internal controls; (ii) failed to take appropriate action to curb the widespread illegal abuses; (iii) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's woefully deficient internal controls and widespread illegal conduct.  Defendant Peña also breached his fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at prices he knew were artificially inflated by the Individual Defendants' misleading statements and omissions.  Defendant Peña also negligently violated section 14(a) of the Exchange Act by causing Wells Fargo to make misleading statements in its 2017 Proxy.   Wells Fargo paid defendant Peña the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $214,000 | $180,048 | $5,000 | $399,048 |
| 2016 | $200,673 | $180,002 | $5,000 | $385,675 |
| 2015 | $135,000 | $180,027 | $5,000 | $320,027 |

45.     The defendants identified in ¶¶23-25, 31-34 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶23, 26-31, 35-44 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶27, 29-30, 38, 40, 44 are referred to herein as the "Audit & Examination Committee Defendants."  The defendants identified in ¶¶27, 30, 36-37, 40-41, 44 are referred to herein as the "Corporate Responsibility Committee Defendants."  The defendants identified in ¶¶26, 29-30, 35-37, 40-41, 44 are referred to herein as the "Risk Committee Defendants."  The defendants identified in ¶¶28, 35, 39, 41-42 are referred

to herein as the "Human Resources Committee Defendants."   Collectively, the defendants identified in ¶¶23-44 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

46.   By reason of their positions as officers, directors, and/or fiduciaries of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, the Individual Defendants owed Wells Fargo and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Wells Fargo and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to Wells Fargo and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wells Fargo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Wells Fargo, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

48.   To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from

engaging in deceptive or fraudulent conduct;

        (c)    ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

        (d)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

        (e)    remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

        (f)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit & Examination Committee Defendants**

49.    Under the Wells Fargo Board's Audit & Examination Committee Charter, the Audit and Examination Committee Defendants, Baker, Hernandez, Peña, Quigley, Swenson, and Vautrinot, owe and/or owed specific additional duties to Wells Fargo.  According to the Audit & Examination Committee Charter, among other things the Audit & Examination Committee Defendants are responsible for assisting the Board in overseeing "Company policies and management activities related to accounting and financial reporting, internal controls, auditing, operational risk and legal and regulatory compliance; the integrity of the Company's financial statements and the adequacy and reliability of disclosures to stockholders; … and to oversee reputation risk related to the [Audit & Examination] Committee's responsibilities described in [the Audit & Examination Committee] Charter."  In addition, the Audit & Examination Committee is required to:

    2.    *Appropriate Response.* Determine that appropriate actions have been taken to resolve matters reported to the Committee that in the Committee's judgment could materially jeopardize the Company's financial condition, results of operations and accuracy of the Company's financial statements,

- 25 -

such as unacceptable control conditions, deviations from policy, high uninsured risks, non-compliance with federal and state laws, and legal actions.

\* \* \*

10. _Regulatory Oversight._ Review regulatory examination reports and letters addressed to the Board. Receive at least quarterly summaries of examination reports and other communications from regulators, including areas of criticism or less-than-satisfactory ratings, and a corrective action program and timetable. Meet with regulators, as a Committee or individually on behalf of the Committee, when requested by regulators or deemed necessary or appropriate by the Committee.

\* \* \*

14. _Internal Reports._ Review periodically internal reports and management actions to address issues related to material financial exposures.

\* \* \*

16. _Company Policies._ …[D]iscuss … significant changes or exceptions to such policies, related to:

- Internal controls;
- Accounting, auditing and financial reporting; and
- Ethical behavior of employees.

**Additional Duties of the Corporate Responsibility Committee Defendants**

50. Under the Board's Corporate Responsibility Committee Charter, the Corporate Responsibility Committee Defendants, Baker, Dean, Hernandez, Milligan, Peña, Runstad, and Vautrinot, owe and/or owed specific additional duties to Wells Fargo. Specifically, among other things, the Corporate Responsibility Committee is required to "monitor the Company's reputation generally, including with customers," and "review and receive updates and reports from management on … customer service and complaint matters and other metrics relating to the Company's brand and reputation, including matters relating to the Company's culture and the focus of its team members on serving [Wells Fargo's] customers."

**Additional Duties of the Human Resources Committee Defendants**

51. Pursuant to the Board's Human Resources Committee Charter, the Human Resources Committee Defendants, Chen, Dean, Engel, James, and Sanger, owe and/or owed

specific additional duties to Wells Fargo.  In particular, these defendants were required to assist the Board in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of the Company's executive officers, including, among other things to:

- conduct the annual Chief Executive Officer performance evaluation process;

- evaluate and approve compensation plans, policies and programs of the Company applicable to executive officers;

- oversee implementation of risk-balancing and risk management methodologies for incentive compensation plans and programs for senior executives and those identified employees in a position to expose the Company to material risk; [and]

\* \* \*

- oversee reputation risk related to the [Human Resources Committee's] responsibilities described in [the Human Resources Committee] Charter.

52.     The Human Resources Committee Defendants were further required to:

…[E]stablish, in consultation with senior management, the overall strategy for the Company with respect to incentive compensation and … oversee the Company's incentive compensation practices to help ensure that they are consistent with the safety and soundness of the Company and do not encourage excessive risk-taking. For this purpose, the HRC shall review and monitor risk-balancing and implementation and effectiveness of risk management methodologies relating to incentive compensation plans and programs for senior executives and those identified employees in positions to expose the Company to material risk.

**Additional Duties of the Risk Committee Defendants**

53.     Pursuant to the Board's Risk Committee Charter, the Risk Committee Defendants, Dean, Duke, Hernandez, Milligan, Peña, Quigley, Runstad, Sanger, and Vautrinot, owe and/or owed specific additional duties to Wells Fargo.  In particular, these defendants were required "to provide oversight of the Company's enterprise-wide risk management framework, including the strategies, policies, procedures, and systems, established by management to identify, assess, measure, and manage the major risks facing the Company."  The Risk Committee was further tasked with:

[A]ssist[ing] the Board and its other committees that oversee specific risk-related issues and serve as a resource to management, including the Company's Chief Risk Officer and management's Enterprise Risk Management Committee ("ERMC"), by overseeing risk across the entire Company and across all risk types, and by enhancing management's and the Board's understanding of the Company's overall risk appetite and enterprise-wide risk management activities and effectiveness."

The Risk Committee Charter further notes, among other things, the Risk Committee's responsibilities include:

- "[R]eview and discuss management's assessment of the Company's aggregate enterprise-wide risk profile and the alignment of the Company's risk profile with the Company's strategic plan, goals and objectives."

- "[R]eview and recommend to the Board the articulation and establishment of the Company's overall risk tolerance and risk appetite, and receive reports from management and, if appropriate, other Board committees, regarding the Company's policies and procedures relating to the Company's adherence to risk limits and its established risk tolerance and risk appetite."

- "[O]versee the strategies, policies, procedures, and systems established by management (which, in some cases, may be subject to the review and approval by another committee of the Board) to identify, assess, measure, and manage the major risks facing the Company, which may include an overview of the Company's credit risk, operational risk, compliance risk, interest rate risk, liquidity risk, investment risk, funding risk, market risk, reputation risk, and emerging and other risks, as well as management's capital management, planning and assessment processes."

- "[R]eceive reports from management, including the Chief Risk Officer and the ERMC, and if appropriate, other Board committees, regarding matters relating to risk management and/or the Company's risk and compliance organization, including regarding emerging risks and other selected risk topics and/or enterprise-wide risk issues. The Committee may request that the Board and/or another committee of the Board review, discuss and assume oversight responsibility for any newly identified risk issues."

**Breach of Duties**

54.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed to the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations

as officers and directors of Wells Fargo, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Wells Fargo's Board during the time of the misconduct.

55.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in widespread improper practices that perpetrated fraud on numerous customers, and caused Wells Fargo to incur substantial damage.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of securities laws, and the Consumer Class Actions alleging a variety of claims concerning the Company's multiple improper schemes.  As a result, Wells Fargo has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that: (i) failed to disclose the Company's continuing inadequate internal controls and oversight failures; (ii) deceived and exploited customers through a variety of improper schemes, including, among others, the Forced Insurance Scheme, the Rate Lock Scheme, the Forex Scheme, and the Retirement Scheme; and (iii) enhanced their executive and directorial positions at Wells Fargo and the profits, power, and prestige that they enjoyed as

a result of holding these positions.  The Individual Defendants, collectively and individually, took the actions set forth herein.

58.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in, among other schemes, the Forced Insurance Scheme, the Rate Lock Scheme, the Forex Scheme, and the Retirement Scheme, and misled the investing public regarding the Company's purportedly enhanced internal controls and Board oversight.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND OF THE COMPANY AND ITS HISTORICALLY INEFFECTIVE BOARD, INTERNAL CONTROLS, AND RISK OVERSIGHT**

61.     Wells Fargo has three reportable operating segments: Community Banking; Wholesale Banking; and Wealth and Investment Management.  In June 2015, shortly after reports first began to surface regarding the Company's now infamous Fake Accounts Scheme in the Community Banking segment, the OCC issued a nonpublic Supervisory Letter directly to defendant Stumpf.  According to the Comptroller, the letter specifically "identif[ied] matters

related to [Wells Fargo's] enterprise-wide risk management and oversight of its sales practices that required corrective action by [the Company]."  The Comptroller also stated:

> The OCC letter included five MRAs that required the Bank to take significant action to address the ***inappropriate tone at the top***, that included the ***lack of an appropriate control or oversight structure given corporate emphasis on product sales*** and cross-selling; the ***lack of an enterprise-wide sales practices oversight program***; the ***lack of an effective enterprise-wide customer complaint process***; the ***lack of a formalized governance process to oversee sales practices and effectively oversee and test branch sales practices***; and ***the failure of the [Company's] audit services to identify the above issues or to aggregate sales practice issues into an enterprise view***.

> The June 2015 Supervisory Letter also ***instructed [Wells Fargo] to take certain corrective actions to address the practices at issue, including improving processes to manage sales practices risk***; re-evaluating compensation and incentive plans to ensure they did not provide an incentive for inappropriate behavior; ***improving processes to independently oversee sales practices risk at an enterprise-wide level***; accelerating the implementation of a fully effective customer complaint process and establishing policy and processes for evaluating complaints related to protected classes; ***having management of the [Company's] Community Bank division establish effective oversight***, as well as a testing and quality assurance function, to review branch sales practices; and ***having the [Company's] audit services develop an enterprise-wide risk management process for sales practices***. The OCC also instructed the [Company] to remediate any consumer harm that resulted from the sales practices at issue.

62.    By November 2015, reports began to surface that the OCC had begun investigating Wells Fargo's Fake Accounts Scheme.  At the time, however, the OCC would not confirm the investigation.  As was later revealed, the reports were true and the existence of the investigation had long been well known by the Individual Defendants.  While Wells Fargo was being investigated however, the Board never once caused the Company to publicly disclose or explain in Wells Fargo's SEC filings: (i) the existence of the Fake Accounts; (ii) how many Fake Accounts were uncovered; (iii) how many customers were overcharged in fees on unauthorized accounts; (iv) how the metrics on account sales growth were compromised by the fake cross-sell figures; (v) that there was an active federal investigation into Wells Fargo's widespread wrongful practices; or (vi) that the OCC had already determined Wells Fargo lacked an appropriate control or oversight structure and had utterly failed to appropriately address the Fake Accounts Scheme.

63.     On September 8, 2016, the CFPB and the OCC issued press releases and the Consent Orders concerning Wells Fargo's Fake Accounts Scheme.  The OCC identified a plethora of "deficiencies and unsafe or unsound practices in [Wells Fargo's] risk management and oversight of [the Company's] sales practices."  In connection with the Consent Orders, Company was forced to agree to pay full restitution to all victims, a $100 million fine to the CFPB, a $35 million penalty to the OCC, and an additional $50 million to the City and County of Los Angeles.

64.     On September 20, 2016, defendant Stumpf appeared before the U.S. Senate Banking Committee to answer questions about the Company's unscrupulous business practices. During the hearing, defendant Stumpf admitted that senior management and the Board "failed to fulfill [their] responsibility to [Wells Fargo's] customers, [the Company's] team members and to the American public."

65.     On October 12, 2016, defendant Stumpf resigned.  The same day, the Company's new CEO, defendant Sloan, shamelessly praised defendant Slumpf for "his leadership in the Company over the last decade."

**THE INDIVIDUAL DEFENDANTS IMPROPERLY TOUT THAT WELLS FARGO SIGNIFICANTLY REFORMED ITS INTERNAL CONTROLS, OVERSIGHT, AND BUSINESS PRACTICES IN THE WAKE OF THE FAKE ACCOUNTS SCHEME**

66.     On October 14, 2016, Wells Fargo held its earnings conference call with investors.  During the call, defendant Sloan promised that his "immediate and highest priority is to restore trust in Wells Fargo."  Defendant Sloan further emphasized the Company's purported commitment to meaningful reforms, stating "[M]ake no mistake, I get it and our team is on it." More, according to defendant Sloan, the Company had already "***made several changes to enhance [its] oversight, expand customer transparency and improve the customer experience***," and would "***continue to be transparent regarding trends across the [C]ompany***."

67.     On October 25, 2016, defendant Sloan gave a company-wide speech to Wells Fargo employees, apologizing for the Company's wrongdoing in connection with the Fake Accounts Scheme and promising to restore trust in Wells Fargo.  After apologizing to employees

for "the pain [they] experienced as team members as a result of [Wells Fargo's] failures," defendant Sloan stated:

> Things went wrong.  Problems need to be fixed. Customers and team members were harmed and need to be cared for. And a better and stronger Wells Fargo must emerge out of all of this… I think we can agree the trust we've lost has affected all of us, so the effort to restore it needs to involve all of us, too.

Defendant Sloan also outlined Wells Fargo's massive failures in connection with the Fake Accounts Scheme, and explained that "[a]ll of this was unacceptable.  My pledge to you is that we will keep these lessons and others we discover [as] part of our ongoing conversation so we may learn from our mistakes."

68.     Over the next few days, Wells Fargo launched a nationwide so-called "Commitment" advertisement campaign.  The Commitment campaign, which included pledges to address the Company's problems and rebuild trust, ran for months on television, radio, and in digital and print form on local and national newspapers.  For example, one of Wells Fargo's nationwide television ads stated, "***Wells Fargo is making changes to make things right***," before listing the measures the Company had purportedly taken to reform the damages from the Fake Accounts Scheme.

69.     On November 3, 2016, the Company filed with the SEC its Quarterly Form on Form 10-Q.  The opening statements of the Form 10-Q touted the Company's "primary values" that purportedly "provide the foundation for everything [Wells Fargo] do[es]," including: (i) "striv[ing] for the highest ethical standards with [its] team members, [its] customers, and [its] shareholders"; and (ii) "with respect to [the Company's] customers, [] striv[ing] to base [the Company's] decisions and actions on what is right for them in everything [Wells Fargo] do[es]." The Form 10-Q also boasted that Company's "vision is to satisfy [its] customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies."  The Form 10-Q similarly touted that Wells Fargo "aspire[s] to create deep and enduring relationships with [its] customers by providing them

with an exceptional experience and by discovering their needs and delivering the most relevant products, services, advice, and guidance."

70.    On March 15, 2017, the Board caused the Company to issue the 2017 Proxy in connection with the 2017 Annual Stockholders meeting, held on April 25, 2017.  The 2017 Proxy, which is discussed in further detail below, repeatedly assured investors that the Board was "building a better Wells Fargo" and ***had already taken "decisive actions" to rebuild trust, "enhance" Board oversight, particularly with respect to risk, and "strengthen [the Company's] culture and make sure [its] practices align with [its] values."***  The 2017 Proxy also repeatedly touted the Board's purported "***commit[ment] to being more transparent***" in disclosures to investors, customers, team members, and other stakeholders.

71.    On March 21, 2017, the Company issued a press release stating that on that day, defendant Sloan "hosted a companywide town hall meeting in which he introduced six long-term goals and provided updates on the company's ongoing work to rebuild trust."  The press release touted the Company's new long-term goals, including, "***set[ting] the global standard in managing all forms of risk***."  According to defendant Sloan, Wells Fargo was "making things right for [its] customers and [its] team members," "fixing problems," "building a better bank for the future," and "reintroduce[ing] to our stakeholders what our Wells Fargo bankers have always been known for, and that's helping [its] customers to succeed financially."

72.    On April 10, 2017, Wells Fargo issued a press release stating that the Company completed its independent investigation of "retail banking sales practices and related matters." According to the press release, the problems at Wells Fargo stemmed from "structural and leadership issues as root causes," but the "***Board and management ha[d] taken decisive action to address issues raised by [the] investigation, promote accountability, strengthen oversight, and rebuild trust***," among other actions.

73.    On April 17, 2017, the Company issued a press release titled "Wells Fargo Launches New Brand Campaign: Building Better Every Day."  According to the press release, the new campaign, which launched the same day, would highlight "***the [C]ompany's commitment to rebuilding trust and creating a better bank for customers, team members, and***

*communities*," and would include ads on television, YouTube, print, digital, broadcast, and mobile channels.   As explained at the time by the Company's Chief Marketing Officer, "'Building Better Every Day' reflects what we are doing to make things right for our stakeholders, and our efforts to develop and offer innovative products and services that ***help our customers reach their financial goals***."

74.   On April 25, 2017, Wells Fargo held a conference call with investors.  During the call, defendant Sanger, the Company's Chairman of the Board, reminded investors that the Company completed its "comprehensive" investigation into the Fake Accounts Scheme, noted that "[t]he foundation of Wells Fargo's success is the trust that [its] customers, community partners and shareholders and other stakeholders place in [the Company]," and admitted that "[Wells Fargo] violated that trust."   Nonetheless, defendant Sanger assured investors that ***the Board was "confident that [it had] identified the root causes of the improper practices that occurred as well as the people responsible for them, and that [the Company] ha[d] take appropriate actions [to resolve the issues]***."   Defendant Sanger further explained that the "[internal investigation] report concluded that the [B]oard's own actions could have been improved by moving the company towards centralization of the risk function earlier than it did" and by "insisting on more detailed and concrete action plans for management," but claimed that ***"the [B]oard and management have taken decisive actions" to remedy these problems***, and that the ***"[B]oard has also strengthened its oversight and governance."***   Defendant Sanger concluded that the Board was "encouraged by the progress the [C]ompany has been making and the [B]oard has complete confidence in [defendant] Sloan and in the rest of the company's senior leadership team. ***The [B]oard believes that the company has a strong foundation to serve our customers and earn back the trust of all our key stakeholders***."

75.   Also in April 2017, the Company published an "open letter" to Wells Fargo customers, written by defendant Sloan, and published in newspapers in over thirty markets across the country.  According to defendant Sloan, his "first act" as the new CEO in October 2016, was to "apologize to our team, our customers, and the public for our company's mistakes," and then to make a "commitment to build a better bank and earn back [customer] trust."  The

letter then outlined certain purported changes the Company had already made, including, among others: (i) "*changes to ensure [Wells Fargo] always puts [its] customers' needs first*"; (ii) "*strengthen[ing the Company's] ethics and risk management*"; and (iii) "*demand[ing] greater accountability from [the Board and senior leaders]*."

76.    On May 5, 2017, the Company filed with the SEC its Quarterly Report on Form 10-Q.  Using substantially similar language to the previous 10-Q discussed above, the Form 10-Q again touted the Company's "primary values" of purported unwavering commitment to customers and their needs, and the Company's strong "ethical standards."  In addition, the Form 10-Q stated:

> In keeping with our primary values and risk management priorities, we announced six new long-term goals for the Company in March 2017, which entail becoming the leader in the following areas:
>
> - *Customer service and advice* – provide *best-in-class service and guidance to our customers to help them reach their financial goals*.
>
> - Team member engagement – be a company where people matter, teamwork is rewarded, everyone feels respected and empowered to speak up, diversity and inclusion are embraced, and "how" our work gets done is just as important as getting the work done.
>
> - Innovation – create new kinds of *lasting value for our customers and businesses* by using innovative technologies and *moving quickly to bring about change*.
>
> - *Risk management – desire to set the global standard in managing all forms of risk*.
>
> - Corporate citizenship – make better every community in which we live and do business.
>
> - *Shareholder value – earn the confidence of shareholders by maximizing long-term value*.

77.    The above statements were all materially misleading and/or omitted material facts necessary to make the statements made therein not misleading.  In truth, as known by the Individual Defendants throughout this time:

(a)    Wells Fargo's internal controls, risk controls, and Board oversight remained woefully inadequate;

(b)     the Company was not committed to meeting customers' needs as touted, but rather continued to place profits above all else, including by cheating customers through a variety of illegal and wrongful practices;

(c)     the Company was not committed to "transparency" as touted, but rather continued to hide well known and widespread problems at Wells Fargo;

(d)     Wells Fargo improperly charged significant fees to tens of thousands of its mortgage borrowers to lock in rates when the Company was at fault for delays;

(e)     Wells Fargo improperly charged hundreds of thousands of customers for auto insurance that they did not need and did not want, often without even notifying such customers that payments were automatically being deducted from their accounts to pay for the insurance; and

(f)     Wells Fargo improperly pressured its customers with low-cost corporate 401(k) plans to roll their holdings into more expensive individual retirement accounts at the Company.

**THE COMPANY IS FORCED TO SLOWLY ADMIT TO A LAUNDRY LIST OF MASSIVE, WIDESPREAD, AND LONG-STANDING ABUSES, ALL RESULTING FROM INADEQUATE GOVERNANCE AND INEFFECTIVE BOARD OVERSIGHT**

78.     As detailed below, while the Individual Defendants were repeatedly touting the above-detailed significant internal control reforms, enhanced Board oversight, and increased public transparency, a slew of additional scandals slowly surfaced, most of which were initially revealed by journalists and/or whistleblowers, rather than Wells Fargo.

**The Improper Rate Lock Scheme**

79.     Wells Fargo is by far the nation's largest mortgage lender, originating $244 billion in home loans last year, or about 12% of all U.S. mortgages.  When Wells Fargo customers begin a home loan or refinance process, like most banks, Wells Fargo typically agrees to "lock in" a stated interest rate for a set period of time, usually thirty to ninety days, while the paperwork is completed.  If the paperwork delays or other delays prevent the closing of the loan prior to the expiration of the "rate lock" period, the period can be extended.  In the event that the delay in

completing the loan application is primarily the Company's fault, Wells Fargo is required to extend the rate lock period at no cost to the customer. Where the delay is caused by the customer and the customer wants to retain the initially quoted interest rate, the customer is charged a "rate lock fee" to extend the rate lock period. The rate lock fee typically ranges from 0.125% to 0.25% of the total amount of a loan, and can easily amount to $1,000 or more.

80.     In early 2017, reports first surfaced that certain former Wells Fargo employees had alleged that for years the Company had been improperly charging rate lock fees to thousands of customers in the Company's Los Angeles region, even though the delay in completing the loan was the Company's fault. These reports received little media attention at the time, and Wells Fargo did not publicly comment on these initial Rate Lock Scheme allegations.

81.     In June 2017, reports began to surface that the CFPB was investigating the Rate Lock Scheme, based on the above-noted early 2017 reports from the Company's customers. In response to inquiries from journalists, a spokesman for the Company acknowledged that Wells Fargo was looking into the issue, but declined to comment on the CFPB probe.

82.     In an article by the *Los Angeles Times*, in mid-July 2017, a former Wells Fargo mortgage banker filed a whistleblower lawsuit alleging the Company falsified records in furtherance of the Rate Lock Scheme, and then fired him for trying to report the practice. According to the whistleblower complaint, Wells Fargo's mortgage-processing and underwriting division was understaffed, leading to chronic delays that were ***not*** the borrowers' fault. Rather than have the bank waive the rate-lock fee, however, Wells Fargo employees would "systematically attempt to charge or pass the rate lock expiration fees on to the customers," including by falsely reporting that "borrowers had submitted incomplete or inaccurate information." According to the Company's employees, the Rate Lock Scheme was endorsed by Wells Fargo management, which essentially refused to have the Company cover the cost of rate-lock extensions even though Wells Fargo was at fault for the delays.

83.     On August 4, 2017, the Company finally acknowledged the Rate Lock Scheme for the first time the Company's public filings with the SEC. Specifically, in the Company's Quarterly Report on Form 10-Q, Wells Fargo acknowledged that the "CFPB has commenced an

investigation into the Company's policies and procedures regarding the circumstances in which the Company required customers to pay fees for the extension of interest rate lock periods for residential mortgages."  By the end of the month, various consumers filed class action lawsuits against Wells Fargo alleging they suffered significant harm as a result of the Rate Lock Scheme.

84.     On October 4, 2017, the Company admitted that the "rate lock extension policy implemented in September 2013 was, at times, not consistently applied, resulting in some borrowers being charged fees in cases where the company was primarily responsible for the delays that made the extensions necessary."  According to Wells Fargo, from September 16, 2013 through February 28, 2017, roughly $98 million in extension fees were assessed to about 110,000 borrowers, and the Company purportedly ceased the improper practice on March 1, 2017.  Wells Fargo also promised to refund customers that were improperly charged rate lock fees.

**The Improper Forced Insurance Scheme**

85.     Force-placed insurance—also known as creditor-placed, lender-placed, or collateral protection insurance ("CPI")—is an insurance policy placed by a lender, bank, or loan servicer on a vehicle when the vehicle owner's own insurance is canceled, has lapsed, or is deemed insufficient and the borrower does not secure a replacement policy. This insurance allows the lender to protect its financial interest in the vehicle.  As detailed below, over the span of several years, when customers took out Wells Fargo loans to purchase vehicles, the Company often *failed to check or ignored whether buyers already had insurance coverage*.  Rather, Wells Fargo automatically imposed coverage on thousands of buyers, often *without notifying them*, even though many drivers already had their own policies.

86.     When customers who checked their bills saw the charges and notified Wells Fargo that they already had car insurance, Wells Fargo was required to cancel the insurance and issue a refund.  Many customers, however, failed to notify Wells Fargo of the redundant insurance because their payments were automatically deducted from their bank accounts and they did not self-identify the charges.  Worse, even when borrowers discovered the improper

1  charges and notified Wells Fargo that they were already insured, Wells Fargo often refused to

2  reverse the erroneous charges and continued demanding payment.

3       87.    On July 27, 2017, the *Times* published an article revealing Wells Fargo's Forced

4  Insurance Scheme.  Citing an internal Wells Fargo report that was obtained by the *Times* and

5  prepared for the Company's executives, the article revealed that over the span of several years,

6  "[m]ore than 800,000 people who took out car loans from Wells Fargo were [improperly]

7  charged for [CPI] auto insurance they did not need, and some are still paying for it."  The *Times*

8  further reported that the "expense of the unneeded insurance… pushed roughly 274,000 Wells

9  Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle

10  repossessions."  According to the *Times*, the Company's internal report also estimated that Wells

11  Fargo owed $73 million to customers that were harmed by the Forced Insurance Scheme.  In

12  response to questions from the *Times*, "Wells Fargo officials confirmed the improper insurance

13  practices took place and said the bank was determined to make customers whole."  The

14  Company's head of consumer lending, defendant Codel, also admitted to the *Times* that "[Wells

15  Fargo has] a huge responsibility and fell short of [its] ideals for managing and providing

16  oversight of… [the Company's] own operations."

17       88.    Also on July 27, 2017, the Company issued a press release admitting its wrongful

18  Forced Insurance Scheme, and claiming that Wells Fargo stopped the practice in September 2016

19  after several months of internal investigations.  The press release did not explain why the

20  Company waited nearly a year after purportedly internally discovering its wrongdoing before

21  finally disclosing it to the public on the same day as the *Times* article exposed the scheme.

22  Instead, the press release again shamelessly touted that in "the fall of [2016], [defendant Sloan]

23  and [Wells Fargo's] entire leadership team committed to build a ***better bank*** and be ***transparent***

24  about those efforts."   In addition, the press release claimed that 570,000 customers were

25  impacted, as opposed to the 800,000 identified by the *Times*, and stated the Company had plans

26  "to remediate [its] auto loan customers… who may have been financially harmed [by the Forced

27  Insurance Scheme]."   The wronged customers were identified by the Company in the press

28  release as follows: (i) "Approximately 490,000 customers had CPI placed for some or all of the

time they had adequate vehicle insurance coverage of their own"; (ii) "In five states that have specific notification and disclosure requirements, approximately 60,000 customers did not receive complete disclosures from our vendor as required prior to CPI placement"; and (iii) "For approximately 20,000 customers, the additional costs of the CPI could have contributed to a default that resulted in the repossession of their vehicle."  According to the Company, the wrongful scheme was caused by "certain external vendor processes and internal controls [that] were inadequate."

89. To date, multiple putative class action cases have been filed against Wells Fargo in connection with the Forced Insurance Scheme.  These class actions allege, among other things, unfair and deceptive practices relating to these CPI policies, and have been filed against the Company in United States federal courts, including in the U.S. District Courts for the Northern District of California and Southern District of New York.

**The Improper Forex Scheme**

90. On October 20, 2017, the *Journal* revealed for the first time that Wells Fargo terminated four employees in connection with certain undisclosed allegations relating to the Company's forex trades.  The *Journal* also disclosed that the Company launched a related internal investigation, and that "regulators are also probing the [Company's] foreign-exchange business."  At the time, a Wells Fargo spokeswoman confirmed the departures after inquiries from the *Journal*, but did not provide any additional details concerning the Company's wrongful practices.

91. The following week, the *Journal* revealed that the Company was specifically under investigation by the U.S. Attorney's Office for the Northern District of California and the Federal Reserve concerning improper forex trading at Wells Fargo, and explained that the investigation appeared to be focused on one large forex fee the Company charged to Restaurant Brands International Inc. ("Restaurant Brands"), the owner of several restaurants including Burger King, Tim Hortons, and Popeyes.  Subsequent articles revealed that Wells Fargo owed Restaurant Brands approximately $900,000 in refunds in connection with improper forex charges.

92.     By November 2017, information concerning the Forex Scheme slowly began to unfold as reports from former Wells Fargo employees surfaced.  These revelations suggested that the $900,000 the Company owed to Restaurant Brands in connection with the Forex Scheme was likely just a drop in the bucket.  For example, as detailed by the *Journal* on November 27, 2017, former employees allege that for more than a decade, Wells Fargo had been secretly and improperly charging excessive forex fees to a substantial portion of the Company's large- to mid-sized business customers.  Indeed, according to the *Journal*, an internal Wells Fargo review showed that "out of roughly 300 [forex] fee agreements [between the Company and its customers], only about 35 companies [or 11.7%] were charged the actual price they had been offered for currency trades handled by Wells Fargo."  More, Wells Fargo "charged some of the highest trading fees around … at least two to eight times higher than the middle-market industry average."  According to former employees, the Company effectively encouraged its forex employees to cheat customers by hiding additional fees in forex trades, because unlike other banks in the U.S., forex "employees [at Wells Fargo] got bonuses based solely on how much revenue they brought in."

93.     The Company did not publicly disclose the Forex Scheme in an SEC filing until March 1, 2018, in its Annual Report on Form 10-K for the year ending December 31, 2017 (the "2017 Form 10-K").  The 2017 Form 10-K disclosed only that Wells Fargo "is reviewing policies, practices, and procedures in its foreign exchange (FX) business [and] is also responding to inquiries from government agencies in connection with their reviews of certain aspects of our FX business."  Although investigations remain ongoing and in early stages, it appears Wells Fargo may owe significant refunds to hundreds or thousands of customers, and likely faces additional penalties and fines pending the outcome of the ongoing investigations.

**The Improper Retirement Scheme**

94.     The 2017 Form 10-K disclosed yet another widespread improper scheme at the Company, the Retirement Scheme.  According to the Company, "in response to inquiries from federal government agencies," the Board is now investigating whether Wells Fargo had made "inappropriate referrals or recommendations [to its Wealth and Investment Management

customers], including with respect to rollovers for 401(k) plan participants, certain alternative investments, or referrals of brokerage customers to the Company's investment and fiduciary services business."  As noted by the *Journal* the same day: "The Justice Department *in late 2017 told the bank to conduct an independent investigation* of its wealth-management business after whistleblowers from the bank alleged sales problems to the agency."  To date, the purportedly "transparent" Individual Defendants have not explained why they waited until March 1, 2018, to publicly disclose any information concerning the Retirement Scheme.

95.     As was later revealed by the *Journal*, the Retirement Scheme is now the subject of a probe by the U.S. Labor Department.  In particular, the Labor Department is currently investigating whether Wells Fargo has been improperly pushing participants in low-cost corporate 401(k) plans to roll their holdings into more expensive individual retirement accounts at the Company, and whether Wells Fargo's retirement-plan services unit improperly pressed account holders to buy Wells Fargo's in-house funds, generating more revenue to the Company.

**Additional Improper Wells Fargo Schemes**

96.     Additional improper Wells Fargo schemes continue to surface on an alarmingly regular basis.  In the past year and a half, multiple lawsuits have been filed against the Company alleging a wide array of wrongdoing, including that Wells Fargo: (i) improperly changed the terms of mortgage loans for bankrupt borrowers; (ii) wrongfully signed up customers for unauthorized life insurance policies; and (iii) overcharged small businesses for credit- and debit-card processing services.  Most recently, on May 17, 2018, the *Journal* revealed that the Wells Fargo unit that handles business banking "improperly altered information on documents related to corporate customers."  Shockingly, it appears that in 2017 and 2018, without customer consent or knowledge, Wells Fargo added personal information such as social security numbers and dates of birth to various clients' paperwork in order to "meet a deadline to comply with a regulatory consent order related to the bank's anti-money-laundering controls."  In other words, the Company engaged in wrongful practices in attempt to purportedly comply with a regulatory consent order.  The OCC is reportedly in the process of investigating the matter.

1

**THE FEDERAL RESERVE FILES AN UNPRECEDENTED
ENFORCEMENT ACTION AGAINST WELLS FARGO**

2

3

97.     On February 2, 2018, the Federal Reserve announced that in response "to recent

4

and widespread consumer abuses and other compliance breakdowns by Wells Fargo," the

5

Federal Reserve sanctioned the Company for failing to have proper risk controls.    The

6

unprecedented Enforcement Action *barred the Company from growing* past the $1.95 trillion in

7

assets it had at the end of 2017 and, as a result of the Board's continuing ineffectiveness and lack

8

of oversight, *required Wells Fargo to replace four Board members*.  As explained in the Federal

Reserve's press release the same day:

9

10

…Concurrently with the [Federal Reserve] Board's action, *Wells Fargo will
replace three current board members by April and a fourth board member by
the end of the year.*

11

12

In addition to the growth restriction, the [Federal Reserve] Board's consent cease
and desist order with Wells Fargo *requires the [Company] to improve its
governance and risk management processes, including strengthening the
effectiveness of oversight by its board of directors*…  The [Federal Reserve]
Board required each current [Wells Fargo] director to sign the cease and desist
order.

13

14

15

16

\* \* \*

17

In recent years, Wells Fargo pursued a business strategy that prioritized its overall
growth *without ensuring appropriate management of all key risks. [Wells
Fargo] did not have an effective firm-wide risk management framework in
place that covered all key risks. This prevented the proper escalation of serious
compliance breakdowns to the board of directors*.

18

19

20

**WELLS FARGO IS FORCED TO PAY $1 BILLION IN CIVIL PENALTIES TO THE
CFPB AND OCC IN CONNECTION WITH THE RATE LOCK SCHEME AND THE
FORCED INSURANCE SCHEME**

21

22

23

98.     On April 13, 2018, Wells Fargo issued a press release announcing its preliminary

24

first quarter 2018 net income.  According to the release, the Company's "preliminary financial

25

results may need to be revised to reflect additional accruals for the CFPB/OCC… to resolve

26

matters regarding [Wells Fargo's] compliance risk management program and [its] past practices

27

involving [the Rate Lock Scheme and the Insurance Scheme]."  The release also disclosed that

28

- 44 -

"the CFPB and OCC ha[d] collectively offered to resolve [the above matters] for an aggregate of $1 billion in civil money penalties."

99.     On April 20, 2018, the CFPB and the OCC each announced the Consent Orders concerning Wells Fargo's improper Rate Lock Scheme and Forced Insurance Scheme.   The Consent Orders confirmed that Wells Fargo would be forced to pay $1 billion in fines and penalties to settle with the CFPB and OCC, with $500 million paid to each regulatory organization respectively.   While both Consent Orders largely focused on the Company's improper Rate Lock Scheme and Forced Insurance Scheme, the OCC Consent Order also noted that in general, ***Wells Fargo operated with "deficiencies and reckless unsafe or unsound practices with respect to [its] compliance risk management program***," including, among other things, by ***"[f]ailing to implement a reliable compliance risk assessment and testing program"*** and by implementing ***"[i]nadequate reporting to the Board regarding compliance concerns, the regulatory landscape, and the [Company's] efforts to correct its complains problems and address regulatory changes."***   The OCC also found that the Company had ***"[f]ail[ed] to adequately develop and implement key elements of its compliance risk management program designed to ensure that the [Company] addressed risks related to potential unfair or deceptive acts or practices since 2014."***

100.    Of note, the Company's Retirement Scheme remains under investigation by the U.S. Labor Department, and that ongoing matter was not settled as part of the Consent Orders. Several other Wells Fargo schemes also remain under investigation.

## THE INDIVIDUAL DEFENDANTS CAUSE WELLS FARGO TO FILE THE MATERIALLY MISLEADING 2017 PROXY

101.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of,

1   reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness

2   with regard to the nonfraud claims.

3       102.   As detailed herein, defendant directors Baker, Chen, Dean, Duke, Hernandez,

4   James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot, violated section 14(a) of

5   the Exchange Act and SEC Rule 14a-9 by causing Wells Fargo to issue the 2017 Proxy that

6   failed to disclose the Rate Lock Scheme, the Forced Insurance Scheme, and the Retirement

7   Scheme, or the seriously deficient internal and disclosure controls that allowed these schemes to

8   continue for years unabated. The Director Defendants' failure to disclose these material facts

9   likewise constitutes a breach of their fiduciary duties.

10      103.   On March 15, 2017, defendants Baker, Chen, Dean, Duke, Hernandez, James,

11  Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot caused Wells Fargo to issue the

12  2017 Proxy in connection with the 2017 Annual Meeting of Stockholders, held on April 25,

13  2017.   In the 2017 Proxy, defendants solicited stockholder votes to, among other things: (i)

14  reelect themselves to the Board; and (ii) approve executive compensation.   Defendants issued

15  materially misleading statements with respect to each of these solicited votes.

16      104.   With respect to Board reelections, the 2017 Proxy repeatedly claimed the Board

17  and the Company had significantly enhanced internal controls, Board oversight, and officer and

18  director accountability in response to the Fake Accounts Scheme, stating the following in support

19  of reelecting the current directors:

20      **Building a Better Wells Fargo**

21      On September 8, 2016, we announced regulatory and legal settlements relating to
        our retail banking sales practices [i.e., the Fake Sales Scheme], which damaged
22      the trust many of our stakeholders have in Wells Fargo. ***Our Board and
        management have taken decisive actions to rebuild the trust of our customers,***
23      ***team members, investors, and other stakeholders through a comprehensive***
        ***action plan outlined below, and to strengthen our culture and make sure our***
24      ***practices align with our values***.

25                              *   *   *

26      **How we are working to rebuild trust – our top priority**

27

28      **Our action plan starts at the top of our organization with our Board**

**Board Leadership Structure and Composition**

- Separated the roles of Chairman and CEO, elected an independent Chairman and Vice Chair, and amended our By-Laws to require that those roles be held by independent directors

- Elected Timothy J. Sloan as CEO

- As part of Board succession planning, added two new directors with expertise to enhance the overall mix of skills and experience on our Board and key committees

**Executive Accountability**

- Our effective compensation design provides our Board with discretion to forfeit and adjust unpaid equity and annual incentive awards

- Our Board used that discretion and took decisive compensation actions to hold our current and former executives accountable

**Board Oversight of Risk**

- ***Our Board enhanced its oversight of conduct risk, including sales practices risk, through the Risk Committee's oversight of enterprise-wide conduct risk and our Company's new Office of Ethics, Integrity, and Oversight, and the expansion of other Board committees' responsibilities for overseeing aspects of conduct risk***

**Board Independent Investigation**

- ***Launched a comprehensive independent investigation into our Company's retail banking sales practices and related matters***

- Our Board expects to disclose findings from its investigation publicly in April prior to our annual meeting

* * *

**Board Leadership Structure and Composition**

*Our Board is committed to sound and effective corporate governance principles and practices*, including robust annual board self-evaluations, board succession planning, board refreshment, board diversity, and recruitment of new directors to complement the existing skills and experience of our Board in areas identified by our Board through its annual self-evaluation process. In addition, *our Board considers the feedback it receives from our investors and has taken a number of actions to increase stockholder rights and enhance our Board's structure that were based, in part, on input received from our investors.*

\* \* \*

**Board Oversight of Risk**

As part of its annual self-evaluation process, *our Board made changes to enhance the risk oversight responsibilities of various Board committees*, including its Risk Committee, and will continue to review its and each of its committee's oversight responsibilities as part of its self-evaluation process.

**Enhanced Board Oversight of Conduct Risk.** *Our Board has enhanced its oversight of conduct risk*, including sales practices risk, by focusing management's reporting to the Board on the alignment of team member conduct with (1) our Company's risk appetite and (2) our Company's culture as reflected in our Vision and Values and our Code of Ethics and Business Conduct.

In addition, our Board enhanced Board committee oversight of conduct risk as follows:

**Risk Committee**

- *Expanded the Risk Committee's oversight responsibilities to include our enterprise-wide conduct risk, risk culture, and new Office of Ethics, Oversight, and Integrity*

- The Risk Committee will continue to oversee our enterprise risk management framework, Corporate Risk function, and key risks identified by our Company.

**Human Resources Committee (HRC)**

- *Expanded the HRC's oversight responsibilities to include human capital management, culture, our Code of Ethics and Business Conduct, and implementation and effectiveness of our Company's ethics, business conduct, and conflicts of interest program*

- The HRC will continue to oversee our incentive compensation risk management program.

**Audit and Examination Committee (AEC)**

- ***Expanded the AEC's oversight responsibilities for legal and regulatory compliance to include our Company's compliance culture***

- The AEC will continue to oversee our operational risk program and all operational risk types, as well as complaints and allegations related to accounting, internal accounting control, and auditing matters.

**Corporate Responsibility Committee (CRC)**

- The CRC will continue to oversee our Company's reputation, customer complaints policy and processes, and complaints and allegations relating to customers and will receive enhanced reporting from management on complaints and allegations from all sources, including the EthicsLine, relating to customers.

\* \* \*

**How Our Company Is Responding — Our Path Forward**

- **We Are Fully Committed to Serving our Customers and We Failed to Live Up To that Commitment.** We recognize that the initial actions our Company took to address the retail banking sales practices matter were not quick or aggressive enough. In addition, our Company failed initially to fully appreciate the impact of this matter on our customers, team members, and other stakeholders.

- **Our Board and Company Are Taking Decisive Actions.** ***Since September 2016, our Board and our Company have taken decisive and comprehensive actions to address retail banking sales practices issues, work to restore the trust of our many stakeholders, and build a better Wells Fargo for the future.*** Wells Fargo has not waited for the completion of our Board's independent investigation, and has ***already taken actions to enhance our compensation and performance management programs, risk management organization and practices, and the ways we reinforce our culture.***

105.    In addition to repeatedly touting that the Board had already taken significant actions to enhance the Company's internal controls, the 2017 Proxy also repeatedly boasted that the Board was committed to increased transparency regarding Wells Fargo's business practices. For example, the 2017 Proxy stated:

- *We also have increased the information we provide to our investors, so we are transparent about the effects of the sales practices issues on our business.*

- *[Wells Fargo is now b]eing more transparent in our disclosures to our investors, customers, team members, and our other stakeholders about the changes we are making and the impact of the retail banking sales practices matter on our business.*

- We have been listening to feedback and are *committed to being more transparent about the changes we are making.*

- Part of our action plan to lead our Company forward is focused on outreach to our customers, team members, investors, regulators, elected officials, and the communities in which we do business. *Our action plan includes being more transparent in our communications.*

- *We are enhancing disclosures on our website, including on a broad range of environmental, social, and governance matters in response to feedback from our investors and other stakeholders.*

106. Defendants' statements in the 2017 Proxy misleadingly suggested that the Board: (i) had already significantly enhanced the Company's internal controls with "decisive and comprehensive actions" that would mitigate wrongdoing and timely apprise the Board of significant risks; (ii) would be "transparent" with customers and the public regarding any problems affecting Wells Fargo's customers and stakeholders; and (iii) strongly discouraged unnecessary or excessive risk taking. The 2017 Proxy omitted any disclosures regarding: (i) significant ongoing deficiencies in Wells Fargo's internal controls; (ii) significant and ongoing deficiencies and reckless unsafe or unsound practices in Wells Fargo's compliance risk management program; and (iii) Wells Fargo's longstanding wrongful schemes to cheat its customers, including, among others, the Rate Lock Scheme, the Forced Insurance Scheme, the Forex Scheme, and the Retirement Scheme.

107. The 2017 Proxy harmed Wells Fargo by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Individual Defendants' misleading statements in the 2017 Proxy, Wells Fargo's stockholders voted to reelect defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot to Wells Fargo's Board.

As detailed herein, just over nine months after the Company's stockholders voted to reelect these defendants, ***the Federal Reserve forced Wells Fargo to remove four Board members in response "to recent and widespread consumer abuses and other compliance breakdowns by Wells Fargo."***

108.   The 2017 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives.   In support of the requested approval, the 2017 Proxy stated:

> We provide our stockholders with an advisory vote to approve the compensation of our named executives or "say on pay." Our Board has held an annual say on pay vote since 2011, consistent with the preference expressed by our stockholders. Our Board will consider the outcome of the vote under Item 3 below when deciding the frequency of future say on pay votes. If our Board continues to elect to hold an annual say on pay vote, the next vote after this year's vote will occur at our 2018 annual meeting.
>
> This year's say on pay vote gives our stockholders an opportunity to express their views on our 2016 compensation program and related decisions for our named executives. ***This proxy statement describes actions taken in response to our retail banking sales practices, our named executives' 2016 compensation, our compensation principles, and our incentive compensation risk management program changes***.
>
> Highlights include:
>
> - ***Our independent Board members and Human Resource Committee (HRC) acted decisively on leadership succession and compensation as a result of our unacceptable retail banking sales practices.*** Our Board and the HRC caused the forfeiture of significant amounts of outstanding equity to promote executive accountability for our retail banking sales practices, eliminated our named executives' 2016 annual incentive awards, and significantly reduced the payout of our continuing named executives' earned long-term equity awards.
>
> - ***Our Company is enhancing and broadening the scope of our incentive compensation risk management practices to discourage unnecessary or inappropriate risk taking, to improve our risk oversight process, and to help prevent detrimental reputation risk outcomes.***
>
> - For all 2016 compensation decisions for our named executives, our HRC continued to be guided by our compensation principles:
>
>   1. Pay for Performance
>
>   2. ***Foster Risk Management Culture***

- 51 -

3.   Attract and Retain Top Executive Talent

4.   ***Encourage Creation of Long-Term Stockholder Value***

109.   Defendants' statements misleadingly conveyed that Wells Fargo's compensation structures placed strong emphasis on fostering risk management and encouraging long-term stockholder value.  In contrast, as revealed over the course of the year following the 2017 Proxy, the Company continued engage in excessive risk taking and widespread illegal practices, costing the Company a billion dollars in fines and significant additional monetary and reputational harm.

110.   As a result of defendants' misleading statements, numerous Wells Fargo's stockholders voted in support of the advisory resolution regarding compensation to defendants Stumpf, Sloan, Shrewsberry, and Tolstedt, totaling $21.3 million, $13 million, $9.3 million, and $8.9 million, respectively, in 2016, without the benefit of material information regarding these defendants' continued and ongoing failure to correct Wells Fargo's numerous improper schemes and serious control deficiencies, and the Individual Defendants continued and ongoing failure to adequately reform the Company's compensation structures to ensure they did not promote widespread illegal activity.

**THE INDIVIDUAL DEFENDANTS CAUSE WELLS FARGO TO REPURCHASE OVER $11.4 BILLION WORTH OF ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES**

111.   In breach of their fiduciary duties to Wells Fargo and its stockholders, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants caused or allowed the Company to repurchase of over 209.8 million shares of its stock at significantly artificially inflated prices.  Despite knowingly or recklessly disregarding that the Company's stock price was inflated due to the illicit schemes, widespread consumer abuses, and other compliance breakdowns detailed above, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

112.   By causing Wells Fargo to conduct the massive share repurchases, defendants signaled to investors their purported belief that Wells Fargo shares were trading at a discount, which caused investors to purchase shares and further drive up the price of the Company's stock.

Because the repurchases resulted in fewer outstanding shares, the repurchases also artificially inflated the Company's financial metrics such as earnings per share.

**The Director Defendants Caused Wells Fargo to Conduct a Massive Stock Repurchase Program**

113.    In January 2016, the Board approved the repurchase of 350 million shares.[3]  As detailed in the chart below, between December 1, 2016 and the present, while the Company was touting significant reforms yet still participating widespread consumer abuses and suffering significant and ongoing compliance breakdowns that were unbeknownst to the investing public, Wells Fargo repurchased approximately 209.8 million shares of its stock, paying over $11.4 billion for them:

| Date of Board Authorization Repurchase Program | Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|---|
| January 26, 2016 | December 2016 | 13,323,757 | $55.84 | $743,998,590.88 |
| | January 2017 | 20,383,453 | $51.91 | $1,058,105,045.23 |
| | February 2017 | 6,503,317 | $56.72 | $368,868,140.24 |
| | March 2017 | 26,187,454 | $57.21 | $1,498,184,243.34 |
| | April 2017 | 4,426,785 | $52.77 | $233,601,444.45 |
| | May 2017 | 18,564,273 | $53.34 | $990,218,321.82 |
| | June 2017 | 20,055,875 | $53.01 | $1,063,161,933.75 |
| | July 2017 | 6,616,050 | $54.73 | $362,096,416.50 |
| | August 2017 | 30,887,246 | $53.26 | $1,645,054,721.96 |
| | September 2017 | 11,519,239 | $51.50 | $593,240,808.50 |
| | October 2017 | 8,090,096 | $54.46 | $440,586,628.16 |
| | November 2017 | 33,350,313 | $54.36 | $1,812,923,014.68 |
| | December 2017 | 9,935,606 | $59.57 | $591,864,049.42 |
| **Total:** | | **209,843,464** | | **$11,401,903,358.93** |

114.    Through the repurchases, defendants falsely signaled to the market that they believed Wells Fargo shares were undervalued and that the repurchases were the best use of the Company's cash.  Because share repurchases lower the number of outstanding shares, the

_____

[3] In January 2016, the Board was comprised of Director Defendants Baker, Chao, Chen, Dean, Duke, Engel, Hernandez, James, Milligan, Peña, Quigley, Runstad, Sanger, Stumpf, Swenson, and Vautrinot.

repurchases also increased the Company's earnings per share, return on equity, return on assets, and other metrics.  Collectively, these actions artificially inflated Wells Fargo's share price with each repurchase, and increased the price for each subsequent repurchase.

115.    Now that the Company's odious business practices have been more fully exposed, Wells Fargo's stock price has fallen to approximately $52 per share, and has traded at approximately that price since the April 20, 2018 Consent Orders were publicly disclosed.  As a result, the approximately 209.8 million shares the Company repurchased between December 2016 and December 2017, for $11.4 billion, are now only worth approximately $10.9 billion, or about half a billion dollars less than the Company paid for them.

**Defendants Issued False or Misleading Statements In Connection with the Share Repurchases**

116.    According to defendants, as stated in Wells Fargo's 2017 Proxy, the Company's repurchase program purportedly is an example of "the Company's success in attaining strategic corporate objectives."  Throughout the time of the above-noted repurchases, however, defendants failed to disclose Wells Fargo's widespread consumer abuses, significant compliance breakdowns, and implementation of a variety of improper schemes that wrongfully harmed its customers, including, among others, the Rate Lock Scheme, the Forced Insurance Scheme, the Forex Scheme, and the Retirement Scheme.  Moreover, after the Fake Accounts Scheme was fully exposed in September 2016, defendants repeatedly and falsely touted Wells Fargo had made significant and meaningful company-wide reforms, significantly enhanced its internal controls and Board oversight, and that the Company maintained an unwavering commitment to transparency.  These materially false or misleading representations, which artificially increased the Company's stock price from about $44 at the beginning of October 2016 to an average price of nearly $55 between December 2016 and December 2017, failed to disclose the following facts:

(a)    Wells Fargo's internal controls, risk controls, and Board oversight were woefully inadequate;

(b)     the Company was not committed to meeting customers' needs as touted, but rather continued to place profits above all else, including by cheating customers through a variety of illegal and wrongful practices;

(c)     the Company was not committed to "transparency" as touted, but rather continued to hide well known and widespread problems at Wells Fargo;

(d)     Wells Fargo improperly charged significant fees to tens of thousands of its mortgage borrowers to lock in rates when the Company was at fault for delays;

(e)     Wells Fargo improperly charged hundreds of thousands of customers for auto insurance that they did not need and did not want, often without even notifying such customers that payments were automatically being deducted from their accounts to pay for the insurance; and

(f)     Wells Fargo improperly pressured its customers with low-cost corporate 401(k) plans to roll their holdings into more expensive individual retirement accounts at the Company.

**In Repurchasing Stock, Wells Fargo Relied on Defendants' False or Misleading Statements**

117.     In repurchasing shares in connection with the stock repurchase program, Wells Fargo relied on defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine.  Wells Fargo justifiably expected defendants to disclose relevant material information in the Company's filings with the SEC, as required by law and SEC regulations.  Wells Fargo would not have repurchased its securities at artificially inflated prices had defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by Wells Fargo should be presumed with respect to defendants' omissions of material information.  Additionally, the "fraud on the market" presumption applies to defendants' misstatements of material fact or failures to disclose material facts.

## <u>DAMAGES TO WELLS FARGO</u>

118.     As a result of the Individual Defendants' rampant improprieties, Wells Fargo has already been forced to pay ***$1 billion*** in fines to regulators for the Company's widespread illegal practices and staggering compliance breakdowns.  This is likely the tip of the iceberg given that

the Company remains subject to a litany of criminal and civil lawsuits and investigations by both the government and private entities.

119. Wells Fargo's illegal practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged its reputation within the business community and in the capital markets, as is evident by the more than tens of billions of dollars of losses in market capitalization after the truth was revealed. Indeed: (i) on July 28, 2017, the day after the Company admitted to the Forced Insurance Scheme, the Company's stock price fell nearly 3% compared to its July 26, 2017 closing price, erasing nearly $8 billion in market capitalization; (ii) on February 5, 2018, the next trading day after the Federal Reserve announced the Enforcement Action, the Company's stock price plummeted more than 9.2%, its sharpest one-day drop in nearly a decade, erasing approximately ***$29 billion*** in market capitalization; and (iii) on April 13, 2018, the day the Company announced the looming $1 billion settlement with the CFPB and OCC, the Company's stock price tumbled 3.4%, wiping out another $8.8 billion in market capitalization.

120. In addition to price, Wells Fargo's customers and current and potential investors consider a bank's ability to protect its customers, curb known abuses, and implement adequate controls to ensure illegal practices are timely discovered and properly addressed. Customers are less likely to use banks that knowingly permit and/or encourage unscrupulous behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information. Wells Fargo's ability to attract customers and investors is now impaired.

121. Further, as a direct and proximate result of the Individual Defendants' actions, Wells Fargo has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred in defending against, and the potential settlement of, multiple civil and criminal legal proceedings brought against the Company related to illegal abuses;

(b)   costs incurred from reimbursing customers the Company harmed;

(c)     costs of overpaying for Wells Fargo stock at inflated prices;

(d)     lost revenues resulting from the Company's forced growth restriction imposed by the Federal Reserve; and

(e)     costs incurred from the substantial compensation and benefits paid to the defendants who have breached their duties to Wells Fargo.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff brings this action derivatively in the right and for the benefit of Wells Fargo to redress injuries suffered, and to be suffered, by Wells Fargo as a direct result of violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Wells Fargo is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

124.    Plaintiff is a current Wells Fargo stockholder and has continuously been a stockholder of Wells Fargo since August 2014.

125.    The current Board of Wells Fargo consists of the following twelve individuals: defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot, and nondefendants Ronald L. Sargent, Karen B. Peetz, Juan A. Pujadas, Maria R. Morris, Theodore F. Craver, Jr., and Celeste A. Clark.  Plaintiff has not made any demand on the Board because such a demand would be a futile and useless act for the reasons stated below.

**Demand Is Excused as to Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot, Because Allowing the Company to Engage in Illegal and Improper Business Practices Was Not a Valid Exercise of Business Judgment**

126.    For years, defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot oversaw and instilled a culture of lawlessness at Wells Fargo and repeatedly failed to stop the numerous improper schemes detailed herein despite their awareness of the wrongdoing and of the Company's woefully inadequate internal controls.   These defendants' actions resulted in

numerous violations of the law and devastated the Company's reputation.  Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot, participated or acquiesced in the misconduct and egregious circumstances complained of herein, which exposed the Company to billions of dollars in penalties, fines, and other damages.  The magnitude and duration of the Board's wrongdoing and failures shows they are incapable of independently considering a demand.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned sales practices that were based on deliberate and widespread improper activities and violations of law.  This pattern and practice of illegal conduct, spanning multiple years, can in no way be considered a valid exercise of business judgment.  Accordingly, demand upon defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot is excused.

**Demand Is Excused Because Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot Face a Substantial Likelihood of Liability for Their Misconduct**

127.   The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot face a substantial likelihood of liability for repeatedly failing to comply with this duty.

128.   As alleged above, six of the twelve current Board members, including Director Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2017 Proxy. Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

129.   These same six Director Defendants have each served as fiduciaries of the Company since *at least* early 2015.  Defendants Duke, Baker, James, Quigley, and Vautrinot have all been Board members since at least early 2015, and defendant Sloan joined the Board in October 2016, after serving in a variety of senior executive roles since at least 2011, including serving as Wells Fargo's Chief Operating Officer from November 2015 to October 2016; Senior Executive Vice President, Wholesale Banking from May 2014 to November 2015; Senior Executive Vice President and Chief Financial Officer from February 2011 to May 2014.  These

defendants knew or should have known that in June 2015, the OCC issued a nonpublic Supervisory Letter directly to the Company's then Chairman, defendant Stumpf, specifically "identif[ing] matters related to [Wells Fargo's] enterprise-wide risk management and oversight of its sales practices that required corrective action by [the Company]," including an "*inappropriate tone at the top*, that included the *lack of an appropriate control or oversight structure*." Nonetheless, these defendants continued to directly or tacitly approve a company-wide culture that incentivized numerous wrongful schemes to cheat its own customers for the Company's profit, thus destroying consumer trust and devastating Wells Fargo's reputation, and utterly failed to implement a reasonable information and reporting system to ensure information concerning widespread and well known fraudulent activity within Wells Fargo was timely shared with upper management and the Board.  In fact, the Company's internal reporting system was so abysmal, its compliance breakdowns were so prevalent, its Board oversight was so ineffective, and its consumer abuses were so widespread, that the Federal Reserve barred the Company from growing, and forced Wells Fargo to replace four directors.  Further, according to the OCC, these defendant failed to implement adequate "reporting to the Board regarding compliance concerns, the regulatory landscape, and the [Company's] efforts to correct its compliance problems and address regulatory changes," and since at least 2014, "[f]ail[ed] to adequately develop and implement key elements of [Wells Fargo's] compliance risk management program designed to ensure that the [Company] addressed risks related to potential unfair or deceptive acts or practices."

130.    Defendants Sloan, Duke, Baker, James, Quigley, and Vautrinot also face a substantial likelihood of liability for breaching their fiduciary duties and violating section 10(b) of the Exchange Act by making the false and misleading statements that inflated the Company's stock price, and then permitting or allowing the repurchase of over $11.4 billion worth of Wells Fargo's stock at inflated prices.

131.    Defendants Baker, Quigley, and Vautrinot sat on the Audit & Examination Committee for at least two years between 2015 and the end of 2017, including Audit & Examination Committee defendants Hernandez, Peña, and Swenson.  These six defendants,

comprising a majority of the Board, failed to assist the Board in overseeing "Company policies and management activities related to … internal controls" and failed to ensure internal controls were sufficient to alert the Board of rampant illegal activity that occurred throughout the Company for years.  These defendants further failed to ensure, as required by the Audit & Examination Committee Charter, "that appropriate actions have been taken to resolve matters reported to the Committee that in the Committee's judgment could materially jeopardize the Company's financial condition."

132.    As members of the Corporate Responsibility Committee, defendants Baker and Vautrinot failed to fulfill their stated duties from at least 2015 to the present.  For example, although the Corporate Responsibility Committee was required to "monitor the Company's reputation generally, including with customers," and "review and receive updates and reports from management on … customer service and complaint matters and other metrics relating to the Company's brand and reputation," these defendants failed to take any action to curb widespread customer abuses that ultimately devastated the Company's reputation when publicly revealed.

133.    As members of the Company's Risk Committee during various times between 2014 and the present, Risk Committee Defendants Duke, Quigley, and Vautrinot, utterly failed to provide effective oversight of the Company's strategies, policies, procedures, and systems, established by management to identify, assess, measure, and manage the major risks facing the Company.   These defendants tacitly approved widespread illegal and unethical conduct throughout Wells Fargo.  As detailed herein, when the truth about Wells Fargo's practices was revealed, the Company faced devastating and highly material declines, including, among other things, substantial losses in customer and investor trust and tens of billions of dollars of decline in market capitalization.

134.    The acts complained of herein constitute violations of the fiduciary duties owed by Wells Fargo's officers and directors and are incapable of ratification.

135.    Wells Fargo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein.   Moreover, despite the Individual Defendants having

knowledge of the claims and counts raised by plaintiff, the current Board has failed and refused to seek to recover for Wells Fargo for any of the wrongdoing alleged by plaintiff herein.

136.    Plaintiff has not made any demand on the other stockholders of Wells Fargo to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Wells Fargo is a publicly held company with over 4.8 billion shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## <u>COUNT I</u>

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Wells Fargo, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

139.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, they caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.  The Individual Defendants engaged in a scheme to defraud Wells Fargo by causing the Company to purchase over $11.4 billion in shares of Wells Fargo stock at artificially inflated prices.

140.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Wells Fargo in connection with the Company's  purchases of Wells Fargo's stock during the period of wrongdoing.

141.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Wells Fargo stock, which were intended to, and did: (a) deceive Wells Fargo and its stockholders regarding, among other things, the Company's deficient internal controls, stretched resources, failed cost-cutting measures, and inability to capitalize on its growing backlog; (b) artificially inflate and maintain the market price of Wells Fargo stock; and (c) cause Wells Fargo to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the Individual Defendants were in possession of material, nonpublic information regarding the above.

142.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

143.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this

Complaint were either known to the Individual Defendants or were so obvious that they should have been aware of them.  Throughout the period of wrongdoing, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

144.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by the Company itself.

145.    As a result of the Individual Defendants' misconduct, Wells Fargo has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

146.    Wells Fargo would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

147.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Wells Fargo stock during the period of wrongdoing.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

148.    Plaintiff brings this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

### COUNT II

**Against Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot for Violation of Section 14(a) of the Exchange Act**

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot.  The section 14(a) Exchange Act claims alleged herein

do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

151.    Director Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy.  The 2017 Proxy contained proposals to Wells Fargo's stockholders urging stockholders to reelect the members of the Board and approve executive compensation.  The 2017 Proxy, however, misrepresented and failed to disclose: (i) deficiencies in Wells Fargo's internal controls that were known to the Board when the 2017 Proxy was filed; (ii) continuing deficiencies and reckless unsafe or unsound practices in Wells Fargo's compliance risk management program; (iii) Wells Fargo's longstanding wrongful schemes to cheat its customers, including, among others, the Rate Lock Scheme, the Forced Insurance Scheme, the Forex Scheme, and the Retirement Scheme; and (iv) Wells Fargo faced significant reputational harm when the truth would inevitably unfold.  By reasons of the conduct alleged herein, Director Defendants Baker, Chen, Dean, Duke, Hernandez, James, Milligan, Peña, Quigley, Sanger, Sloan, Swenson, and Vautrinot violated section 14(a) of the Exchange Act.  As a direct and proximate result of these Director Defendants' wrongful conduct, Wells Fargo misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Wells Fargo's recommendation to reelect the current Board and approve certain executive compensation.

152.    The misleading information contained in the 2017 Proxy was material to Wells Fargo's stockholders in determining whether or not to elect the Director Defendants and approve certain executive compensation.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the 2017 Proxy were essential links in the reelection of nominees to the Board. The proxy solicitation process in connection with the 2017 Proxy were essential links in the approval of the executive compensation plan.

153.    Plaintiff, on behalf of Wells Fargo, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2017 Proxy in connection with the improper reelection of the members of the Board and approval of executive compensation.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of Wells Fargo and because of their ability to control the business and corporate affairs of Wells Fargo, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner.

156.    Each of the Individual Defendants violated their fiduciary duties by creating and failing to act to stop the culture of lawlessness within Wells Fargo.  The Individual Defendants repeatedly encouraged and/or acquiesced to unlawful and unethical behavior throughout the Company's business operations.

157.    This culture of lawlessness was directly responsible for the Company's repeated violations of the law detailed herein.  In particular, as a result of the Officer Defendants' violation of their duties of loyalty and care, and the Director Defendants' violation of their duty of loyalty, for several years the Company: (i) engaged in widespread illegal practices, including, among others, the Rate Lock Scheme, the Forced Insurance Scheme, the Forex Scheme, and the Retirement Scheme; (ii) failed to take appropriate action to curb the widespread abuses; (iii) portrayed that the Board and the Company had taken "decisive actions" to properly address the Company's widespread problems, including adequately enhancing Board oversight and transparency; and (iv) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public.  Each of the Individual Defendants also breached their fiduciary duties by causing or allowing Wells Fargo to repurchase its stock on the open market at

- 65 -

1  prices the Individual Defendants knew were artificially inflated by their misleading statements

2  and omissions.

3        158.    As a direct and proximate result of Individual Defendants' foregoing breaches of

4  fiduciary duties, the Company has suffered significant damages, as alleged herein.

5        159.    Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

6                              **COUNT IV**

7            **Against the Individual Defendants for Waste of Corporate Assets**

8        160.    Plaintiff incorporates by reference and realleges each and every allegation

9  contained above, as though fully set forth herein.

10       161.    As a result of the illegal business practices detailed herein, the Individual

11  Defendants have caused Wells Fargo to incur substantial costs.  In fact, the Company has already

12  incurred $1 billion in fines related to some of the misconduct detailed herein.

13       162.    Individual Defendants also wasted corporate assets by paying improper

14  compensation and bonuses to certain of its executive officers and directors that breached their

15  fiduciary duty.

16       163.    As a result of the waste of corporate assets, Individual Defendants are liable to the

17  Company.

18       164.    Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

19                              **COUNT V**

20            **Against the Individual Defendants for Unjust Enrichment**

21       165.    Plaintiff incorporates by reference and realleges each and every allegation set

22  forth above, as though fully set forth herein.

23       166.    By their wrongful acts and omissions, the Individual Defendants were unjustly

24  enriched at the expense of and to the detriment of Wells Fargo.  The Individual Defendants were

25  unjustly enriched as a result of the compensation and director remuneration they received while

26  breaching fiduciary duties owed to Wells Fargo.

27       167.    Plaintiff, as a stockholder and representative of Wells Fargo, seeks restitution

28  from these defendants, and each of them, and seeks an order of this Court disgorging all profits,

- 66 -

1  benefits, and other compensation obtained by these defendants, and each of them, from their

2  wrongful conduct and fiduciary breaches.

3      168.    Plaintiff, on behalf of Wells Fargo, has no adequate remedy at law.

4                          **PRAYER FOR RELIEF**

5      WHEREFORE, plaintiff demands for a judgment as follows:

6      A.      Against all of the Individual Defendants and in favor of the Company for the

7  amount of damages sustained by the Company as a result of the Individual Defendants'

8  violations of law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

9      B.      Directing Wells Fargo to take all necessary actions to reform and improve its

10  corporate governance and internal procedures to comply with applicable laws and to protect

11  Wells Fargo and its stockholders from a repeat of the damaging events described herein,

12  including, but not limited to, putting forward for stockholder vote, resolutions for amendments

13  to the Company's Bylaws or Articles of Incorporation and taking such other action as may be

14  necessary to place before stockholders for a vote the following Corporate Governance Policies:

15          1.      the removal of Director Defendants Sloan, Duke, Baker, James, Quigley,

16  and Vautrinot from the Board;

17          2.      a proposal to strengthen Board oversight and supervision of Wells Fargo's

18  business practices;

19          3.      a proposal to strengthen the Company's disclosure controls to ensure

20  material information is adequately and timely disclosed to the SEC and public;

21          4.      a proposal to strengthen the Board's oversight with respect to stock

22  repurchases;

23          5.      a proposal to ensure that all Board members take appropriate action to rid

24  the Company of its lawless culture;

25          6.      a proposal to strengthen the Board's supervision of operations and

26  develop and implement procedures for greater stockholder input into the policies and guidelines

27  of the Board;  and

28

1          7.     a provision to permit the stockholders of Wells Fargo to nominate at least

2 three candidates for election to the Board;

3        C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and

4 state statutory provisions sued hereunder, including attaching, impounding, imposing a

5 constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on

6 behalf of Wells Fargo has an effective remedy;

7        D.     Awarding to Wells Fargo restitution from the defendants, and each of them, and

8 ordering disgorgement of all profits, benefits, and other compensation obtained by the

9 defendants;

10        E.     Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs,

11 and expenses; and

12        F.     Granting such other and further relief as the Court deems just and proper.

13 **JURY DEMAND**

14     Plaintiff demands a trial by jury.

15 Dated: May 17, 2018                 ROBBINS ARROYO LLP

16                                         BRIAN J. ROBBINS
KEVIN A. SEELY
STEVEN M. MCKANY

17

18                                     /s/*Brian J. Robbins*

19                                     BRIAN J. ROBBINS

20                           600 B Street, Suite 1900
San Diego, CA 92101

21                         Telephone: (619) 525-3990
Facsimile: (619) 525-3991

22                         E-mail: brobbins@robbinsarroyo.com
           kseely@robbinsarroyo.com

23                                 smckany@robbinsarroyo.com

24                         Attorneys for Plaintiff

25

26 1261537

27

28

- 68 -

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## VERIFICATION

I, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violations of the Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____5/17/18_____

_____
TIMOTHY HIMSTREET